# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAMES DEJOHN,<br><br>    **Plaintiff,**<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    **Defendant.** | Civ. No. 18-15346 (KM)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

    Plaintiff James DeJohn brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to review a final decision of the Commissioner of Social Security ("Commissioner") denying his claims to Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and his claim for Supplemental Security Income ("SSI") under Title XVI. DeJohn seeks to reverse the finding of the Administrative Law Judge ("ALJ") that he has not met the Social Security Act's definition of disabled for the period beginning December 1, 2014.

    The issue presented is whether the decision of the ALJ to deny DeJohn's application for DIB and SSI is supported by substantial evidence. For the reasons stated below, this matter is remanded to the Commissioner.

### A. Facts

    Mr. DeJohn is 50 years old (R. 30) He is five feet six inches and weighs approximately 210 pounds. (R. 30, 544) Mr. DeJohn asserted before the ALJ that he had not graduated from high school (R. 31), but elsewhere reported that he had completed high school (R. 580).

    DeJohn has a history of opioid use; he reports that he most recently used heroin in July 2015. (R. 36, 353) DeJohn is from New Jersey but briefly relocated with his former fiancée to New Mexico in 2013. (R. 329) In the course

of moving to New Mexico, he tapered off his use of methadone to treat his opioid use. (R. 353) Simultaneously, he began experiencing increased anxiety and depression. (*Id.*)

Prior to the onset of his anxiety in 2013, Mr. DeJohn had operated forklifts for seven years. (R. 364) Upon moving to New Mexico, he was briefly employed as a forklift operator. (R. 493)

### 1. Anxiety and Depression Onset

Mr. DeJohn presented to the psychiatric urgent care clinic of University of New Mexico Hospital ("UNMH") on April 29, 2013 with general anxiety. (R. 368) He reported that he had recently discontinued methadone outpatient treatment. (*Id.*) Nevertheless, he tested positive for having a Benzodiazepine in his urine. (*Id.*)

He returned to UNMH on May 3, 2013. (R. 229) He complained that he had been hearing his "heartbeat in his ears" for weeks and that his heart was beating fast. (R. 239) He reported a recent "tapering off of methadone approximately 2 weeks ago" (R. 331–32) He was diagnosed with anxiety. (R. 332)

On January 7 and 10, 2014, DeJohn presented to a facility located at 8205 Camino Pasisano NW, Albuquerque, New Mexico (this appears to be First Choice Community Healthcare). (R. 341–42, 345) He presented with anxiety and was given various different medications (including Clonazepam, a Benzodiazepine) for his anxiety, that had minimal effect. (*Id.*)

DeJohn was then treated at University of New Mexico Hospital from January 22, 2014 until December 3, 2014. (R.353–77) During this time, doctors attempted to transition DeJohn to a new anxiety medicine as the risk of addiction to Benzodiazepines was high as a result of his past opioid use. (R. 354) On April 2, 2014, he reported that he was doing better (R. 366)[1] He was next seen in May 2014 and July 2014. During these visits he denied opioid

---

[1] DeJohn also reported that he was arrested and spent 20 days in jail in March 2014 due to getting into an argument with his girlfriend. (R. 366)

2

use, maintained a normal appearance without signs of acute distress, but stated that his medications were not improving his anxiety and he still had trouble staying asleep at night. (R. 360–65) He also indicated that he had been actively looking for employment (R. 361)

Meanwhile, on May 13, 2014, DeJohn was seen by Will Kaufman. (R. 337)[2] He complained of frequent panic and anxiety and was seeing a clonazepam prescription. (*Id.*) He gave conflicting information about when he had last seen a psychiatrist, giving the impression that "he was dishonest about his current psychiatric care." (*Id.*)

### 2. Hospitalization and Continued Treatment

At some point in November 2014, Mr. DeJohn returned to New Jersey after he and his fiancé lost a child and their relationship ended.

Mr. DeJohn resumed his prior occupation of operating a forklift. However, at the end of November 2014, Mr. DeJohn was operating a forklift when it fell over and nearly killed a fellow employee. (R. 37) As a result, Mr. DeJohn was fired. (R. 489, 493) DeJohn later reported that he was under the influence of illicit substances at the time of the accident. (R. 489)

On December 1, 2014 he was admitted for one night to Trinitas Hospital due to anxiety. (R. 384)[3] He then missed a follow-up appointment on December 8, 2014 with Dr. Jo-Annmay Tan. (R. 351–52) From January 2015 to April 2015, DeJohn attended intensive group therapy sessions multiple times per week. (R. 397–500) DeJohn during this time was also being instructed to take his medication as prescribed. (*Id.*) DeJohn transferred out of this program on April 21, 2015 and a mental health clinician at Trinitas reported that DeJohn was "psychiatrically stable and will continue with medication management." (R. 504)

---

[2]     The records in exhibit 2F appear to be incomplete. Page 337 indicates that it is page 5 of 23. The records however begin on page 5 of 23 rather than 1 and then pick up again on page 15 of 23. (*See* R. 338)

[3]     Mr. DeJohn seeks DIB and SSI beginning from December 1, 2014.

On July 1, 2015, DeJohn presented for a psychosocial assessment at Newark Beth Israel Medical Center at their outpatient behavioral health center. (R. 577–82) He presented because his anxiety and depression medications had run out. He stated that he moved back to NJ a year ago and was under treatment. (R. 577) However, he reported that he started to feel better so he stopped going. (*Id.*) He reported that he had substance abuse issues as part of his medical history. (R. 579) DeJohn stated that he had used heroin on and off since he was 19 years old, most recently he used in June 2015. (*Id*) His affect was "constricted" and he had a hard time completing his sentences at times, but he was cooperative, hypertalkative, coherent, and capable of reality-based thinking. (R. 581) Psychiatrist Niama Jacobs, M.D., recommended DeJohn be treated with individual therapy.

Mr. DeJohn was next seen on September 4, 2015. (R. 583) He reported anxiety, depression, insomnia, sleeping for only 2–3 hours per night, panic attacks, hallucinations, crying often, and paranoia. (*Id.*) DeJohn was alert, oriented, and coherent, but appeared disheveled and anxious. (*Id.*)

On October 23, 2015, DeJohn returned to Beth Israel. His stated that the frequency of his panic attacks had gone from 7 times per week to 3 times per week and that he was still depressed and anxious. (R. 592) He demonstrated a constricted affect but otherwise demonstrated normal thought process, orientation, cognitive function and fair judgment. (*Id.*) DeJohn's follow up reports with Beth Israel from November 2015 is similar to the October report. (R. 594)

DeJohn's symptoms continued with varying degrees of severity over the next year. In February 2016, he continued to state that he didn't sleep well and was depressed. (R. 596) In July 2016 he was again seen and appeared well-groomed, maintained good eye contact, displayed no evidence of depression or psychosis and did not voice any complaints about either. (R. 597) He was described as "stable." (*Id.*) However, in September 2016, he reported feeling very depressed, reported having panic attacks, sleeping a minimal amount, and

4

that he had trouble mentally being able to get out of bed. (R. 599) He reported that during this time he was taking care of his father, bathing him, feeding him, etc. (*Id.*)

His medication was then switch to Effexor and in October 2016, DeJohn reported that this medicine was making him "feel good." (R. 601) By December 2016, however, DeJohn indicated that the effects of Effexor had "fizzled out" and was feeling worse. (R. 603)

### 3. Leg Pain

On October 9, 2013, DeJohn was seen at First Choice Community Health Center for a "lump in his [left] leg" that was determined to be varicose veins (R. 343) In February 2015, he reported pain in his lower extremities if he stood for more than 30 minutes or sat for more than 60 minutes, but he was not otherwise taking medication for his varicose veins. (R. 379) There are few other records concerning this leg issue.

### 4. Disability Determination

On February 18, 2015, DeJohn was seen by the State's physician, Dr. Rambhai C. Patel. (R. 379–80) Dr. Patel performed a physical evaluation of DeJohn. During his evaluation, he complained of lower back pain that had caused him pain every day for the last two years,[4] anxiety, and pain from his varicose veins. (R. 379) DeJohn received a normal evaluation from Dr. Patel on the passive range of motion chart, receiving an 80 out of 90 on lumbar spine flexion and the straight leg raising tests. (R. 381–82) Dr. Patel found that "he can do both fine and gross movements in both hands and the grip was normal. Gait, he was walking without any walking device without any sensory or motor deficit." (R. 380)

The following day, Ernesto Perdomo, PhD, conducted a psychological evaluation of DeJohn. (R. 384–86) Dr. Perdomo noted that Mr. DeJohn was

---

[4] I note that the medical records do not appear to discuss this back pain in any detail. However, subsequently, in February 2016, Mr. DeJohn slipped and fell, which appears to have led to significant back pain. *See infra*, Section A.5.

5

able to understand and follow instructions of moderate complexity, his thought process was well organized and focused, he spoke coherently and relevantly, and had fair to mildly-impaired short term memory. (R. 385) Nevertheless, he diagnosed DeJohn with severe anxiety, severe panic disorders, and moderate-to-severe depression. (R. 386)

Dr. G. Goldberg reviewed DeJohn's treatment records from Trinitas. On June 15, 2015 he stated that DeJohn complains that his anxiety had gotten worse after January 2015 and that he appeared to be in a structured, 7-hour a day treatment program that indicates a severe impairment that could limit his workplace functioning. (R. 502) At the time he had insufficient evidence to evaluate the claim. (*Id.*) A week later, he reviewed the records from Trinitas and concluded that his treatment records do not confirm a level of severity claimed by DeJohn because DeJohn was routinely described as actively involved in group therapy discussions, positive, and at times reported he was looking for a job. (R. 503) He noted that DeJohn had numerous positive labs for opiates that were not prescribed which appeared to complicate his anxiety and cognitive functioning. (*Id.*)

### 5. Fall in 2016

On February 24, 2016, Mr. DeJohn slipped on a plastic bag and fell in a grocery store. (R. 527) DeJohn landed on his back and as a result began experiencing back pain almost immediately thereafter. (*Id.*)

Mr. DeJohn complained of back, shoulder, and wrist pain and was initially treated by a chiropractor, Dr. Jeremy Robinson, and given a conservative treatment plan using anti-inflammatory medications. (*Id.*; R. 528) After five months of treatment, his pain had not subsided and he was diagnosed with two herniated discs and three bulging discs with radicular syndrome. (R. 510, 528, 534–37) He was then treated by pain management specialists at Raritan Anesthesia Associates. DeJohn underwent a lumbar epidural injection on November 16, 2016. (R. 509) Mr. DeJohn's medical records with respect to his back injury do not include records after this procedure.

6

During this time, DeJohn also complained of right wrist pain. (R. 552–54) However, an MRI of his wrist did not reveal any acute injuries, such as fractures, dislocation, or tendon tears. (*Id.*)

There are no other medical records that discuss DeJohn's present injuries with respect to his back, shoulder, and wrist.

### B. Procedural History

On December 1, 2014, Mr. DeJohn applied for DIB. (R. 13) The application was denied initially (R. 137) and on rehearing. (R. 146–47) On May 23, 2017 the ALJ held a hearing. (R. 26)

On August 8, 2017, the ALJ issued a decision (R. 12–20) denying disability benefits on the ground that Mr. DeJohn was still able to perform work at step five of the sequential evaluation. (*Id.*)

Mr. DeJohn appealed. On August 27, 2018, the Appeals Council concluded that there were no grounds for review and affirmed the decision of the ALJ. (R. 1)

On October 26, 2018, Mr. DeJohn filed this action seeking to overturn the ALJ's decision to deny benefits. (DE 1) Initially assigned to Chief Judge Jose L. Linares, the case was reassigned to me upon Judge Linares's retirement. (DE 15)

## I. DISCUSSION

### A. Standard of Review

As to all legal issues, this Court conducts a plenary review. *See Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). As to factual findings, this Court adheres to the ALJ's findings, as long as they are supported by substantial evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citing 42 U.S.C. § 405(g)). Where facts are disputed, this Court will "determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Zirnsak v. Colvin*, 777 F.3d 607,

610 (3d Cir. 2014) (internal quotation marks and citation omitted). Substantial evidence "is more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Id.* (internal quotation marks and citation omitted).

When there is substantial evidence to support the ALJ's factual findings, this Court must abide by them. *See Jones*, 364 F.3d at 503 (citing 42 U.S.C. § 405(g)); *Zirnsak*, 777 F.3d at 610-11 ("[W]e are mindful that we must not substitute our own judgment for that of the fact finder."). This Court may, under 42 U.S.C. § 405(g), affirm, modify, or reverse the Commissioner's decision, or it may remand the matter to the Commissioner for a rehearing. *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984); *Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 865–66 (3d Cir. 2007). A person is deemed unable to engage in substantial gainful activity

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 1382c(a)(3)(B).

In reaching a decision, an ALJ is only required to addressed relevant examinations, opinion evidence, and the claimant's complaints. *See Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981) (An ALJ is only required to "indicate that s/he has considered all the evidence, both for and against the claim, and provide some explanation of why s/he has rejected probative evidence. . . . [T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice.").

Remand is proper if the record is incomplete, or if there is a lack of substantial evidence to support a definitive finding on one or more steps of the five-step inquiry. *See Podedworny*, 745 F.2d at 221–22. Remand is also proper if the ALJ's decision lacks adequate reasoning or support for its conclusions, or if it contains illogical or contradictory findings. *See Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119–20 (3d Cir. 2000).

### B. The Social Security Act and the Five-Step Process

Under the authority of the Social Security Act, the Administration has established a five-step evaluation process for determining whether a claimant is disabled and entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920. This Court's review necessarily incorporates a determination of whether the ALJ properly followed the five-step process prescribed by regulation. The steps may be briefly summarized as follows:

**Step One:** Determine whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. 20 C.F.R. §§ 404.1520(b), 416.920(b). If yes, the claimant is not disabled. If not, move to step two.

**Step Two:** Determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled. If the claimant has a severe impairment, move to step three.

**Step Three:** Determine whether the impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20 C.F.R. Pt. 404, subpt. P, app. 1, Pt. A. (Those Part A criteria are purposely set at a high level to identify clear cases of disability without further analysis). If so, the claimant is automatically eligible to receive benefits; if not, move to step four. *Id.* §§ 404.1520(d), 416.920(d).

**Step Four:** Determine whether, despite any severe impairment, the claimant retains the Residual Functional Capacity ("RFC") to perform past

relevant work. *Id.* §§ 404.1520(e)–(f), 416.920(e)–(f). If yes, the claimant is not disabled. If not, move to step five.

**Step Five:** At this point, the burden shifts to the Commissioner to demonstrate that the claimant, considering his age, education, work experience, and RFC, is capable of performing jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007). If so, benefits will be denied; if not, they will be awarded.

DeJohn's appeal hinges on the ALJ's findings at step three and as to his RFC findings, which he says are not supported by substantial evidence. (Pl. Br. at 14–15). As to Mr. DeJohn's RFC, a claimant's RFC is not a medical diagnosis as such. *See Titles II & XVI: Med. Source Opinions on Issues Reserved to the Comm'r*, SSR 96-5P, 1996 WL 374183 at *2 (S.S.A. July 2, 1996). Instead, it is an administrative finding reserved for the Commissioner. *Id.*; *see also Pintal v. Comm'r of Soc. Sec.*, 602 F. App'x 84, 87 (3d Cir. 2015) ("The ultimate legal determination of disability is reserved for the Commissioner."); *see also Robinson v. Colvin*, 137 F. Supp. 3d 630, 644 (D. Del. 2015) ("[O]pinions that a claimant is 'disabled' or 'unable to work' are not medical opinions and are not given special significance because opinions as to whether or not a claimant is disabled are reserved for the Commissioner."); 20 C.F.R. § 404.1527(d) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.").

An ALJ is not bound by the capacity determinations of a treating physician. *See Brown v. Astrue*, 649 F.3d 193, 197 n.2 (3d Cir. 2011). Indeed, the determination of disability is legal in nature, and is reserved for the ALJ within the constraints of the statute and regulations. *See Mays v. Barnhart*, 78 F. App'x 808, 813 (3d Cir. 2003) ("[T]he ALJ . . . is not required to seek a separate expert medical opinion."); *Glass v. Colvin*, No. 14-237, 2015 WL 5732175 at *1 (W.D. Pa. Sept. 30, 2015) ("[T]he ALJ is not limited to choosing between competing opinions in the record . . . .").

Medical opinions need be credited by the ALJ only if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). An ALJ may, if appropriate, elect to disregard a medical opinion entirely: "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996); *see also Irey v. Colvin*, No. 13-7423, 2016 WL 337019 at *4 (E.D. Pa. Jan. 27, 2016) ("[T]he ALJ is not bound by the opinion of any one physician[] and can reject an opinion if there is a lack of support or a finding of contradictory evidence in the record.").

### C. The ALJ's Decision

On August 8, 2017, the ALJ issued a decision finding that Mr. DeJohn was not disabled within the meaning of the Social Security Act. (R. 20) The ALJ determined that DeJohn's impairments were severe, but he also determined that, given DeJohn's age, education, work experience, and RFC, he was capable of making a successful adjustment to other jobs that existed in significant numbers in the national economy. (R. 19)

The ALJ followed the five-step process outlined above to determine that DeJohn was not disabled. The ALJ's findings are summarized as follows:

**Step One:** At step one, the ALJ determined that DeJohn had not engaged in substantial gainful activity for a continuous 12-month period from December 1, 2014 through the date of the opinion. (R. 14)

**Step Two:** At step two, the ALJ determined that DeJohn had the following seven severe impairments: degenerative disc disease, degenerative joint disease of the right shoulder, obesity, generalized anxiety disorder, panic disorder, depressive disorder, and opioid use disorder in remission. (R. 14)

**Step Three:** At step three, the ALJ determined that DeJohn did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Pt. 404, subpt. P., app. 1. (R. 15–16) The ALJ made reference to several listings including 1.02,

11

1.04, 12.04, and 12.06, finding that claimant's impairments did not meet or medically equal the criteria listed. (*Id.*)

**Step Four:** At step four, the ALJ determined that DeJohn could not perform his past relevant work as a forklift operator (R. 19), but that based on Mr. DeJohn's RFC, he could perform light work as defined in 20 CFR 404.1567(b) and 416.967(b):

> [T]he claimant is able to lift and carry up to 10 pounds frequently and 15 pounds occasionally; stand and walk for a total of one hour in an eight-hour workday; sit for a total of seven hours in an eight-hour workday; and have superficial and transactional contact with coworkers and the public. The claimant is able to simple. Routine [sic], and repetitive work at an SVP 1 or SVP of 2. He is able to work in a 'low stress' job, defined as having no more than occasional changes in the work setting.

(R. 16) The ALJ determined that although the claimant experiences some limitations from his impairments, "there is no credible indication that he is prevented from performing basic work activities." (R. 18)

**Step Five:** At step five, the ALJ considered Mr. DeJohn's age, education, work experience and RFC in conjunction with the Medical-Vocational Guidelines. (R. 19–20) Relying on the testimony of the vocational expert, the ALJ identified several representative jobs that DeJohn could perform: (1) ticket checker, or (2) surveillance systems monitor.

Accordingly, the ALJ determined that Mr. DeJohn was not disabled at any point, as defined by the Social Security Act, from December 1, 2014 on. (R. 20)

### D. Analysis of Mr. DeJohn's Appeal

#### 1. The ALJ's Step Three Evaluation

At step three, the ALJ found that Mr. DeJohn does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Pt. 404, subpt. P., app. 1. (R. 15–16) Mr. DeJohn argues that the ALJ erred at step three by failing to account for his physical and mental impairments and failing to address medical equivalents. (Pl. Br. 17–33).

### i. Discussion of Obesity

Obesity was removed as a "listed impairment" in 1999, but, as the Third Circuit has recognized, "this did not eliminate obesity as a cause of disability. To the contrary, the Commissioner promulgated [Social Security Ruling] 00–3p, indicating how obesity is to be considered. This SSR replaced an automatic designation of obesity as a Listed Impairment, based on a claimant's height and weight, with an individualized inquiry, focused on the combined effect of obesity and other severe impairments afflicting the claimant." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 503 (3d Cir. 2009) (citing SSR 00–3p, 65 Fed.Reg. 31039, 31040–42 (May 15, 2000)); *see also Webster v. Astrue*, 628 F.Supp.2d 1028, 1031 (S.D.Iowa 2009) (explaining "This SSR points out that obesity is a life long impairment, and that although the obesity listing was deleted, the impairment requires special consideration in the evaluation of a disability claim," and, on remand, directing "both the ALJ and counsel . . . to read this ruling carefully, and then apply it to the facts of Plaintiff's case").

In 2002, SSR 00–3p was superseded by SSR 02–1p, 67 Fed.Reg. 57859–02 (Sept. 12, 2002), but SSR 02–1p did not materially amend SSR 00–3p. *See Diaz*, 577 F.3d at 503.

> SSR 02–1p provides the following guidance:
>
> [W]e consider obesity to be a medically determinable impairment and remind adjudicators to consider its effects when evaluating disability. The provisions also remind adjudicators that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately. They also instruct adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity.

Social Security Ruling, SSR 02–1p; Titles II and XVI: Evaluation of Obesity, 67 FR 57859–02.

Obesity is thus mentioned as a potential exacerbating factor in several listings. For instance, Listing 1.00, concerning musculoskeletal disorders, states that:

> Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. Pt. 404, subpt. P., app. 1, ¶ 1.00Q.

At step two, the ALJ found that Mr. DeJohn's obesity was a severe impairment. (R. 19) However, at step 3 the ALJ failed to consider the cumulative and additional effects of Mr. DeJohn's obesity when determining if he qualified for one of the listed impairments.

The ALJ's discussion of obesity at step three amounts to a blanket statement that the ALJ considered the evidence. This is not the same thing as an ALJ's actually discussing the evidence and clearly setting forth the reasons for his decision as *Diaz* and *Burnett* require, at step three. To be sure, there is conflicting evidence as to the severity of Mr. DeJohn's obesity as DeJohn was never diagnosed with obesity by any physician nor does he point to anything in the medical records suggesting such a diagnosis. Nonetheless, as discussed below, the ALJ's failure to consider Mr. DeJohn's obesity at step three is problematic in conjunction with the analysis of the combination of Mr. DeJohn's other impairments at step three.

### ii. Medical Equivalence Discussion at Step 3

DeJohn next asserts that the ALJ's analysis failed to consider the combined effect of all of his impairments at step 3. (DE 27 at 22–33) DeJohn contends that the ALJ provides no analysis that suggests that he considered the combined effects of his seven severe impairments. I agree and will therefore remand this matter for further findings.

14

In step three, this Circuit's precedent "requires the ALJ to set forth the reasons for his decision." *Burnett*, 220 F.3d at 119 (citing *Cotter v. Harris*, 642 F.2d 700, 704–05 (3d Cir. 1981)). *See also Diaz*, 577 F.3d at 504 ("an ALJ must clearly set forth the reasons for his decision. Conclusory statements that a condition does not constitute the medical equivalent of a listed impairment are insufficient. The ALJ must provide a 'discussion of the evidence' and an 'explanation of reasoning' for his conclusion sufficient to enable meaningful judicial review.") (citing *Burnett*, 220 F.3d at 119). A blanket statement that an ALJ has considered evidence is not the same thing as actually discussing the evidence and clearly setting forth the reasons for his decision as *Diaz* and *Burnett* require at step three.

Here, the ALJ found that "the record does not support that the claimant's impairments meet or equal any of the listings of impairments in 20 CFR Part 404, Subpart P, Appendix 1, including sections 1.02, 1.04, 12.04, 12.06." (R. 15) The ALJ goes on to state as to each listing:

- "none of the medical evidence established findings or symptoms sever enough to qualify under listing 1.02";
- "none of the medical records establishes findings or symptoms sever enough to qualify under listing 1.04"; and
- "the severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06."

(R. 15) There is little to no analysis of specific records, weighing of the evidence, or comparing the evidence to determine if these listings or their equivalents are met to support these conclusions as required at step three. The ALJ, to be sure, is entitled to sift the evidence and decide which accounts to credit. Here, I express no view as to what those findings should be; I reverse because I find that "the ALJ merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairment, without identifying

the relevant listed impairments, discussing the evidence, or explaining his reasoning." *Burnett*, 220 F.3d at 119.

Accordingly, because I am not satisfied that Mr. DeJohn's seven impairments were adequately considered in combination at step three, I will further remand for additional findings as to how, if at all, these impairments impact the ALJ's findings at step three, and of course, the subsequent steps.

## II. CONCLUSION

For the foregoing reasons, the case is **REMANDED** to the Commissioner for additional proceedings consistent with this opinion.

This case, perhaps to an unusual degree, presents a web of mutually aggravating impairments, each of which was perhaps not totally disabling in itself. The court wishes to be certain that their combined effect was taken into account. On remand, the ALJ shall fully develop the record and explain his or her findings at step three. If necessary, the assessment at step four shall likewise consider all pertinent medical evidence and explain how any conflicts were reconciled. Finally, if it is necessary to reach step five, the ALJ is directed to make the requisite factual findings with regard to the level and transferability of DeJohn's skills.

I express no view, however, as to what those findings should be. A separate order will issue.

Dated: March 27, 2020

/s/ Kevin McNulty

**Hon. Kevin McNulty
United States District Judge**